UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,                        Case Number 24-20232

v.                                           Honorable David M. Lawson

WILLIAM DEWAYNE GRANT,

          Defendant.
_____/

## OPINION AND ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND ESTABLISHING NEW CASE MANAGEMENT DATES

Defendant William Grant was arrested by Detroit Police officers on April 2, 2024 as he was walking in a roadway with the handle of an AR-style handgun protruding from the backpack he was carrying. A grand jury subsequently indicted him on the charge of possessing a firearm as a convicted felon. Grant filed a motion to suppress the gun arguing that the stop, frisk, and subsequent search of his person violated the Fourth Amendment. The Court held an evidentiary hearing on August 1, 2024, at which one of the arresting officers testified. The evidence shows that the police properly questioned Grant on the street, and the information they learned evolved into a proper factual basis supporting the search and seizure of the weapon. Because the officers' conduct was consistent with the requirements of the Fourth Amendment, the motion to suppress the evidence will be denied.

I.

According to the testimony, at around 7:30 p.m. on April 2, 2024, Detroit Police Department Officers Xavier Dolly and Roger Drake were riding in their patrol car when they spotted Grant walking in the vehicle travel portion of Maplelawn, a public street in the City of Detroit. Drake was driving; Dolly sat in the passenger seat. Dolly testified that a city ordinance

prohibits pedestrians from walking in the street when a sidewalk is available, as it was on Maplelawn.

The officers' patrol vehicle was equipped with a dash camera, which captured a shot of Grant walking in the street toward the officers some distance away. Dolly also was wearing a body camera, which activated when he initiated the encounter with Grant, although the audio portion of the recording did not engage until about eight seconds after the video started.

Grant was headed toward a Jeep SUV parked on the south side of Maplelawn. As he passed the patrol car, Dolly saw that the handle of an AR-style pistol protruded from a bookbag Grant was carrying in his right hand. Dolly rolled down his window and asked Grant if he had a license to carry the pistol — a "CPL." That query was not recorded on Dolly's body camera, which had not yet engaged in audio recording mode. Grant did not respond to the question. Instead, he brought the bookbag closer to his body, put his head down, and walked toward his car.

Dolly exited his police vehicle and approached Grant, who was wearing a jacket over a vest. When Dolly reached out to touch Grant to question him further about the weapon he saw, Dolly felt the vest and determined that it actually was body armor. Officer Drake also exited the police vehicle and assisted in detaining Grant.

Dolly asked Grant again if he had a CPL, and Grant responded that he did not know what that was. The officers placed Grant in handcuffs, removed the body armor, and search him, his backpack, and his car. In the bookbag, Dolly found a black Extar brand "AR pistol" loaded with live 5.56 mm rounds, other ammunition, and a machete-style knife. Further inquiry by the officers revealed that Grant was a convicted felon and that he did not possess a permit to carry a concealed pistol.

On May 1, 2024, the defendant was charged in a single-count indictment with possessing a firearm after having been convicted of a felony, contrary to 18 U.S.C. § 922(g)(1).

II.

Grant argues that the police officers had no basis to question and detain him on the street that evening because he was not violating any law and he was simply walking to his car. He says that the officers' body camera footage calls into question their assertions that they saw an "AR style handle" of a weapon protruding from the defendant's bookbag before they approached him or opened the bag. He also asserts that even if a portion of such a weapon was sighted, reasonable suspicion that a crime was in progress was lacking because the officers did not know that the defendant was a convicted felon, nor did they know that he did not possess a valid permit to carry a concealed weapon, which is permissible under Michigan law.

The government counters that the officers had reasonable suspicion to initiate an investigatory stop when they saw the handle of the weapon in Grant's bookbag and he refused to respond to the question about having a CPL. Other facts gained from the stop, the government asserts, caused the encounter to evolve into a proper arrest justified by probable cause.

The video footage that was admitted in evidence at the evidentiary hearing does not contradict Officer Dolly's testimony. Because of the delayed audio, the exhibit does not confirm that he initially asked Grant for his CPL. But the Court finds that Dolly was a credible witness and accepts his testimony that the question was asked when Dolly spotted the gun handle. And the Court credits the testimony that Grant's reaction to the question was sufficient to provoke suspicion over the legality of his possession of a concealed pistol.

It is well established that the Fourth Amendment forbids the police from arresting an individual unless they are aware of facts that establish probable cause that the person was

committing or had committed a crime. *Dunaway v. New York*, 442 U.S. 200, 208 (1979). However, "[a]n officer may detain an individual for a short time for investigatory purposes if, under the totality of the circumstances, [he] has 'reasonable suspicion,' that is, 'a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts.'" *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (quoting *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012); citing *Terry v. Ohio*, 392 U.S. 1 (1968)). In order to evaluate the basis of the reasonable suspicion, the Court "'must assess not only what the officers knew at the time of the initial stop but also the information developed during the course of that initial stop.'" *Ibid.* (quoting *Hoover*, 682 F.3d at 497). "'When an officer makes a *Terry* stop, he may also perform a precautionary search — known as a 'frisk' or 'pat down' — whenever he has 'reasonable suspicion' that the person searched may be armed and dangerous.'" *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016) (quoting *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)).

At the outset, the officers did not need reasonable suspicion to inquire in passing, after sighting a weapon being carried mostly concealed in a backpack, whether the defendant possessed a permit to carry legally a weapon concealed on his person. The contention that there may not have been any outwardly visible criminal activity in progress before the officers' approach is immaterial to the legality of that initial approach because, contrary to the defendant's position, police are not required to have reasonable suspicion of a crime merely to approach a citizen in a public place and ask him questions. *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (holding that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions"). In such encounters, "[s]o long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Ibid.* (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)).

That rule finds its roots in *Terry v. Ohio*, where the Court explained that "not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." 392 U.S. at 19 n.16 (cleaned up). Here, the defendant was not "seized" when the officers inquired, while still seated in their passing patrol car, whether the defendant held a concealed carry permit. Instead, he was seized only *after* he refused to respond to that preliminary query, and the failure to respond and produce a valid gun permit itself was justification for the ensuing seizure and detention for further inquiry, because the applicable state statutes compel a person carrying a concealed firearm both to have a valid permit on his person and to present the permit upon demand by police.

The sighting of a weapon being carried partly or mostly concealed in the defendant's bag, along with his refusal to answer the query about whether he held a valid concealed pistol license, sufficed to create reasonable suspicion that the defendant was violating state law by carrying the weapon that officers sighted in his possession. "Michigan's concealed carry statute requires an individual to have his concealed carry license in his possession at all times that he is carrying a concealed pistol." *Nykoriak v. Wileczek*, 666 F. App'x 441, 445 (6th Cir. 2016) (citing Mich. Comp. Laws § 28.425f(1)). The law also mandates that "[a]n individual who is licensed to carry a concealed pistol and who is carrying a concealed pistol . . . shall show both of the following to a peace officer upon request by that peace officer: (a) His or her license to carry a concealed pistol. (b) His or her state-issued driver license or personal identification card." Mich. Comp. Laws § 28.425f(2). Furthermore, "[a] licensed individual who is carrying a concealed pistol and is stopped by a peace officer must 'immediately disclose to the peace officer that he or she is carrying a pistol . . . concealed upon his or her person.'" *Ibid.* (quoting Mich. Comp. Laws § 28.425f(3)). The

defendant's refusal to answer the officers' inquiry, apparent attempts to evade further scrutiny, and failure to produce a pistol permit upon demand, all added up to justify a reasonable suspicion that he was carrying the weapon illegally.

Grant cites *United States v. Floyd*, No. 21-20010 (E.D. Mich. July 6, 2021), a case decided by another judge in this district, as support for the idea that arresting a person seen carrying a pistol is unconstitutional because Michigan's conceal-carry law permits such conduct. That reliance, though, is misplaced. In *Floyd*, the district court found, based on the video record, that officers had seized the defendant by placing hands on him immediately upon his exit from a liquor store premises, *before* inquiring whether he held a permit to carry a concealed weapon. *See* Order, ECF No. 17, PageID.121. Here, the opposite occurred: the defendant was seized *after* he ignored the initial query and failed to produce a valid CPL upon request.

The sight of a suspected weapon in the defendant's bag, along with the fact that the defendant ignored a direct question about whether he possessed a CPL, and his attempts to evade further scrutiny by turning away and attempting to obscure the bag and suspected weapon from the officers' sight, add up to create reasonable suspicion to justify an investigative detention to determine whether the weapon was legally possessed. *See United States v. Smith*, 594 F.3d 530, 539 (6th Cir. 2010) ("[T]he officers were justified in making an investigatory *Terry* stop because the officers had a reasonable suspicion of criminal activity under the totality of the circumstances, which included . . . Smith's efforts, with his head down, to push past the officers and exit the building as the officers entered."); *United States v. Russ*, 508 F. App'x 377, 382 (6th Cir. 2012) ("[I]t is sufficient to conclude, as the district court did, that once Boldin saw what he recognized to be a firearm in Russ's waistband, the totality of the circumstances at that point — including Russ's demeanor, his response when asked if everything was okay, his physical contact with and

- 6 -

flight from Boldin — provided reasonable suspicion to justify an investigative detention."). Once the officers had ascertained through further inquiry that the defendant did not possess a permit to carry a concealed weapon, further investigation including retrieval of the suspected weapon was justified. Moreover, a search of the suspect's person and the bag that was in his immediate control was justified because officers were authorized to conduct a protective sweep for weapons based on a reasonable suspicion that the defendant was armed and might, if released, pose a danger to the officers or other persons. *Pacheco*, 841 F.3d at 390.

Finally, despite the fact that the bookbag was separated from the defendant's person and placed on the ground upon the initial approach, the officers were justified in searching it immediately after the defendant was detained, because a protective search during a *Terry* stop may include intrusion into items and areas within a suspect's immediate control, to determine if there are accessible weapons that may pose a risk to officer safety. *United States v. Walker*, 615 F.3d 728, 732 (6th Cir. 2010) ("[T]he concern for officer safety extends not only to a suspect himself but to 'the area surrounding a suspect' where he might 'gain immediate control of weapons.' Unzipping the bag more than it was already unzipped was an efficient and expedient way to determine whether a gun lay on the top of the bag, ready for use. . . . On this record, it is fair to say that the search was reasonably designed to discover weapons that might pose a threat to the officers' safety, namely weapons lying on the top of the already partially unzipped duffel bag." (quoting *Michigan v. Long*, 463 U.S. 1032, 1049 (1983); cleaned up).

III.

The factual record developed at the evidentiary hearing establishes that the police officers had articulable facts that gave rise to a reasonable suspicion that defendant Grant was committing

a firearm offense.  The stop and search of the backpack was reasonable within the meaning of the Fourth Amendment.

Accordingly, it is **ORDERED** that the defendant's duplicate motions to suppress evidence (ECF Nos. 16, 17) are **DENIED**.

It is further **ORDERED** that the deadline for entering a guilty plea under a plea agreement is reset to August 28, 2024, the parties shall appear for a final pretrial conference **on August 28, 2024 at 10:00 a.m.**, and the jury trial shall begin **on September 10, 2024 at 8:30 a.m.**

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Dated:   August 13, 2024